IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.                          CRIMINAL ACTION NO. 2:22-cr-00183

JAMON L. WOODSON,

        Defendant.

**MEMORANDUM OPINION AND ORDER**

The Court is currently tasked with calculating Defendant Jamon L. Woodson's ("Defendant") advisory Guidelines range. For the reasons more fully explained below, the Court finds (1) that Defendant committed wanton endangerment under West Virginia Code § 61-7-12, and (2) that the Court must cross-reference the Aggravated Assault section, U.S.S.G. § 2A2.2.

        I.        BACKGROUND

Just before 5:00 p.m. on June 30, 2022, a handful of men were standing on the sidewalk of Leon Sullivan Way in Charleston, West Virginia. (ECF No. 62-1(72), at 19:09.) Behind them stood Jet Life Apparel ("Jet Life"), a clothing store owned by Jonathan Kennedy ("Kennedy"). (*Id.*) Kennedy was inside. (*Id.*)

As the men milled around outside, Defendant drove his dark SUV down Leon Sullivan Way and came to a stop in front of Jet Life. (*Id.* at 18:51.) Defendant leaned out the window and struck up a conversation with the men. (*Id.*) The talk was a short one, lasting only 20

1

seconds or so. (*Id.* at 18:51–19:13.) But as Defendant inched his car forward, ready to leave, Kennedy walked outside, eager to see what was going on. (*Id.* at 19:18.) As soon as Kennedy stepped outside, Defendant spotted him, put his vehicle in park, and exited. (*Id.* at 19:20.) Defendant quickly approached Kennedy, a 9mm pistol in hand. (*Id.* at 19:22.) Defendant and Kennedy then had a standoff on the sidewalk.[1] (*Id.* at 19:23–27.) But this tense exchange was also very brief—Defendant returned to his car within seconds.[2] (*Id.*) As Defendant climbed back into his car, Kennedy returned to Jet Life. (*Id.* at 19:29–34.) He reappeared moments later, carrying a 12-guage shotgun with a 30-round drum magazine. (*Id.* at 19:37; *see also* PSR at 5, ¶ 8.) However, by the time Kennedy was back outside, Defendant had his car in gear and was ready to leave. (ECF No. 62-1(72), at 19:39.) Kennedy realized that Defendant was about to drive away, so he yelled "Where you going? . . . Pull that shit on me!" (*Id.* at 19:39–41.) Defendant obliged him and fired two rounds, but he struck nobody. (*Id.* at 19:42.) One round hit Jet Life's door frame, the other a storefront window a few inches off the ground. (PSR at 6, ¶ 10; ECF No. 49 at 2.) Kennedy took shelter in Jet Life. (ECF No. 62-1(72), at 19:43.) Defendant sped off. (*Id.*)

Defendant might have escaped unharmed, but his problems were just beginning. Law enforcement investigated the shooting and found a spent 9mm casing in the street. (PSR at 6, ¶

---

[1] The backstory behind this confrontation is rather murky. The parties agree that Defendant believed Kennedy, or his associates, had placed a hit on him. (ECF No. 62.) But the reason for the hit remains unclear. Defendant claims the dispute "involved an underage female (not involved with the Defendant)." (*Id.* at 2.) However, there is also evidence suggesting the hit arose from a drug trafficking dispute. Kennedy and Mr. Honeycutt (Defendant's business partner) were in the middle of a heated argument when Defendant arrived. (ECF No. 62-1(13).) Video surveillance captured that argument, and it appears that Kennedy believed Honeycutt—or someone close to him—had infringed on Kennedy's drug territory. (*Id.*)
[2] Notably, Defendant never raised or pointed his gun at anyone while out of his SUV.

10.) Officers also talked to witnesses and reviewed surveillance footage from Jet Life, all of which identified Defendant as the shooter. (*Id.*)

A federal grand jury soon indicted Defendant. (ECF No. 20.) The single-count indictment charged him with being a felon[3] in possession of ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).[4] (*Id.*) Defendant pled guilty on December 16, 2022. (ECF No. 47.)

The Court then directed the Probation Officer to prepare a Presentence Investigation Report ("PSR"). The Probation Officer did so and, when calculating Defendant's advisory Guidelines range, she recommended the Court apply U.S.S.G. § 2K2.1, which covers unlawful possession of ammunition. (PSR at 8, ¶ 20.) However, the Probation Officer also recommended the Court cross-reference U.S.S.G. § 2A2.2, the aggravated assault section. (*Id.* at 9, ¶ 26.) She reasoned that Defendant committed aggravated assault when he fired at Kennedy and others, and § 2K2.1(c)(1)(A) requires the Court to cross-reference any other offense connected to Defendant's illegally possessed ammunition. (*Id.*)

This recommended cross-reference raised two issues. First and foremost, what other offense(s) did Defendant commit? As the Court previously explained, Defendant could not have committed aggravated assault because "West Virginia law does not recognize" that crime. (ECF No. 52.) Nevertheless, he certainly committed some other crime(s) when he shot at Kennedy. Second, if Defendant committed a state law offense that the Guidelines do not expressly cover,

---

[3] Defendant had previously been convicted of Conspiracy to Distribute More than 500 Grams of Cocaine and a Quantity of Marijuana in violation of 21 U.S.C. §§ 846 and 841(b)(1)(B). (ECF No. 20.)
[4] The indictment here cites 18 U.S.C. § 924(a)(2), but as the parties agreed at the December 16 plea hearing, the correct subsection is § 924(a)(8). (ECF No. 20.) Congress recently amended § 924(a) and moved the penalties for a § 922(g)(1) offense from subsection (a)(2) to (a)(8). *See* Bipartisan Safer Communities Act, Pub. L. No. 117-159, § 12004(c), 136 Stat. 1313, 1329 (2022). That amendment took effect on June 25, 2022, five days before Defendant's instant offense, so subsection (a)(8) is the applicable subsection here. *See generally United States v. Davis*, No. 23-4000, 2023 WL 4197444, at *1 n.1 (4th Cir. June 27, 2023) (per curiam) (unpublished).

what is the correct analytical framework to determine which Guidelines section should apply? The Court invited the parties to brief their respective positions on these issues. (ECF No. 57.) The parties have done so, (ECF Nos. 58, 61), and the matter is now ripe for adjudication.

## II. GOVERNING LAW

Before turning to the legal issues presented herein, a review of the relevant Guidelines sections is in order. Section 2K2.1 applies to Defendant's conduct. *See United States v. Burns*, 781 F.3d 688, 691 (4th Cir. 2015). However, § 2K2.1 may not be the only section that applies. "[W]hen a felon in possession of [ammunition] uses that [ammunition] in connection with another offense, the sentencing [court] should also determine the base offense level for that other offense." *Id.* (citing U.S.S.G. § 2K2.1(c)(1)). If the Guidelines specifically cover the offense, the Court applies that Guidelines section. U.S.S.G. § 2X1.1(a). If not, the Court applies § 2X5.1. U.S.S.G. § 2X1.1 cmt. 3. Should the other offense[5] receive a higher offense level calculation than the felon-in-possession offense does under § 2K2.1, the Court must "apply the offense level for that other offense, thereby cross-referencing it to determine the ultimate sentence." *Burns*, 781 F.3d at 691. "[T]he [G]overnment has the burden to prove a cross-referenced offense by a preponderance of the evidence." *United States v. Slager*, 912 F.3d 224, 232 (4th Cir. 2019) (internal quotation marks omitted) (quoting *United States v. Davis*, 679 F.3d 177, 182 (4th Cir. 2012)).

---

[5] Importantly, the other offense committed need not be charged. U.S.S.G. § 2K2.1 cmt. n.14(C).

4

III. DISCUSSION

A. *Other Offense*

As the Court sees it, Defendant may have committed two other offenses connected to his illegal possession of ammunition—(1) attempted second-degree murder, and (2) wanton endangerment.[6] The Court addresses each in turn.

1. Attempted Second-Degree Murder

a.

Attempt crimes have two elements: "the defendant [must have] (1) had [a] 'culpable intent' to commit the substantive crime and (2) t[aken] a 'substantial step towards completion of the crime that strongly corroborates that intent.'" *United States v. Haas*, 986 F.3d 467, 478 (4th Cir. 2021) (quoting *United States v. Engle*, 676 F.3d 405, 419–20 (2012)). In other words, he "must . . . have had the requisite *mens rea*" and "taken a substantial step towards" committing the substantive crime. *Braxton v. United States*, 500 U.S. 344, 349 (1991).

The substantive crime here is second-degree murder. It follows, then, that Defendant could not have committed attempted second-degree murder unless he took a substantial step

---

[6] Despite the Court previously explaining that Defendant did not commit aggravated assault under West Virginia law, (ECF No. 52), the Government nevertheless urges the Court to directly cross-reference U.S.S.G. § 2A2.2. (ECF No. 55 at 5–6.) The Government seems to believe that the Court can disregard West Virginia's criminal laws and instead determine whether Defendant violated § 2A2.2. (*Id.*) The Guidelines forbid that. Section 2K2.1(c)(1)(A) limits the applicable cross-reference to "other offense[s]" to which the ammunition was connected. U.S.S.G. § 2K2.1(c)(1)(A). As the Supreme Court recently explained, the term "offense" means "the [v]iolation or [b]reaking of a [l]aw." *Denezpi v. United States*, --- U.S. ----, 142 S. Ct. 1838, 1844 (2022) (quoting *Gamble v. United States*, 587 U.S. ----, 139 S. Ct. 1960, 1965 (2019)); *see also* U.S.S.G. § 2K2.1(c)(1)(A) cmt. n.14(C) (defining "[]other offense" as "any federal, state, or local offense" other than the instant possession charge, "regardless of whether a criminal charge was brought"). It follows, then, that the "other offense" cross-referenced must be a criminal law on the books. *See United States v. Carroll*, 3 F.3d 98, 102 (4th Cir. 1993) (per curiam). The Guidelines certainly play an important role in criminal law, *Peugh v. United States*, 569 U.S. 530, 534 (2013), but they are not, in and of themselves, criminal statutes that impose criminal penalties. *Cf. Beckles v. United States*, 580 U.S. 256, 262 (2017) (rejecting a vagueness challenge to the Guidelines because they neither "define criminal offenses [nor] fix the permissible sentences for criminal offenses." (emphasis omitted)). As such, the Court cannot directly cross-reference § 2A2.2.

5

towards committing murder and did so with the requisite *mens rea*. There lies the issue: what *mens rea* does attempted second-degree murder require? To answer that question, the Court must analyze both the substantive crime of second-degree murder, and federal attempt law.[7]

b.

Second-degree murder is well-defined. Under 18 U.S.C. § 1111, second-degree "[m]urder is the unlawful killing of a human being with malice aforethought." And to prove malice, the Government need not "show an intent to kill or injure." *United States v. Williams*, 342 F.3d 350, 356 (4th Cir. 2003). The Government may instead prove malice with "evidence of conduct which is reckless and wanton and a gross deviation from a reasonable standard of care, of such a nature that a [factfinder] is warranted in inferring that [the] defendant was aware of a serious risk of death or serious bodily harm." *Slager*, 912 F.3d at 235 (alterations in original) (quoting *United States v. Ashford*, 718 F.3d 377, 384 (4th Cir. 2013)).

Attempted second-degree murder takes a little more work to define. "[T]here is no general attempt statute in the federal criminal code," so "attempts to commit a crime are punishable only if the statutory definition of the crime itself proscribes attempts." *United States v. Duroseau*, 26 F.4th 674, 680 (4th Cir. 2022) (quoting *United States v. Muresanu*, 951 F.3d 833, 837 (7th Cir. 2020)). 18 U.S.C. § 1113—the statute at issue here—proscribes the "attempt[] to commit murder." But although § 1113 does a great deal, *i.e.*, outlawing attempted murder, it does not define the crime's elements.

---

[7] One would think the Court should use West Virginia law to determine whether Defendant committed attempted murder. West Virginia is, after all, the only government that could prosecute Defendant for that offense. However, the Fourth Circuit inexplicably uses federal law when cross-referencing § 2A2.1. *See, e.g.*, *United States v. Lynn*, 912 F.3d 212, 216 (4th Cir. 2019) (applying federal law to determine whether the defendant committed attempted murder despite there being no federal jurisdiction over that offense). The Court is bound by that methodology and thus uses federal law.

Fortunately, the Court has guidance in understanding the elements under § 1113. The Supreme Court has said that where, as here, "the statute does not specify the elements of" an attempt crime, the Court must apply "those required for an 'attempt' at common law." *Braxton*, 500 U.S. at 350–51 n.* (citing *Morissette v. United States*, 342 U.S. 246, 263 (1952)). Common law attempt has two elements: the defendant must have had (1) the "*specific intent* to commit the" underlying crime, *id.* (emphasis added), and (2) have taken "a 'substantial step' toward completing the offense," *United States v. Resendiz-Ponce*, 549 U.S. 102, 107 (2007). *Cf. United States v. Taylor*, --- U.S. ----, 142 S. Ct. 2015, 2020 (2022) (explaining that, for attempted Hobbs Act robbery, which does not define "attempt," "the government must prove two things: (1) The defendant *intended* to unlawfully take or obtain personal property by means of actual or threatened force, and (2) he completed a 'substantial step' toward that end." (emphasis added)). This specific intent requirement applies to the gamut of attempt crimes—murder included. *Braxton*, 500 U.S. at 350–51 n.* ("Although a murder may be committed without an intent to kill, an attempt to commit murder requires a specific intent to kill.")

A word on specific intent is in order. "[T]he common-law concept of specific intent" corresponds, "[i]n a general sense," with the word "purpose." *United States v. Bailey*, 444 U.S. 394, 405 (1980). That is, a defendant acts with specific intent when he sets out "with the specific purpose of" causing the prohibited result. *Id.*; *see also* Wayne R. LaFave, *Substantive Criminal Law*, § 5.2(a) (3d ed. Oct. 2022 update) (explaining that a defendant acts with specific intent "when he consciously desires [to bring about] th[e] [prohibited] result"). It is not enough that the defendant expects, or even knows, that he will break the law; he must "consciously desire[]" to do so. *Bailey*, 444 U.S. at 404 (quoting *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 445 (1978)).

7

c.

The Government would have the Court adopt a less stringent *mens rea*. (ECF No. 55 at 6–7.) In its view, attempted second-degree murder only requires malice aforethought, as opposed to the specific intent to kill.[8] *Id.* The Court disagrees for two reasons.

First, attempt is an inchoate crime, distinct from the substantive crime attempted, *United States v. Pratt*, 351 F.3d 131, 135 (4th Cir. 2003), that requires "a heightened mental state [to] separate[] criminality itself from otherwise [innocent] behavior," *Bailey*, 444 U.S. at 405.

Second, the Government's understanding of attempt is out of step with not only the Supreme Court, *Braxton*, 500 at 350–51 n.*, and Fourth Circuit, *Martin v. Taylor*, 857 F.2d 958, 961 (4th Cir. 1988) ("An attempt crime requires specific intent to commit a crime."), but also every other Circuit. *See, e.g.*, *United States v. York*, 48 F.4th 494, 499 (7th Cir. 2022) ("To sustain an attempt conviction, the government is required to prove that a defendant acted with the specific intent to commit the underlying crime and that he took a substantial step towards completion of the offense." (internal quotation marks omitted)); *United States v. McCarron*, 30 F.4th 1157, 1162 (9th Cir. 2022) ("An attempt conviction requires evidence that the defendant 'intended to violate the statute and took a substantial step toward completing the violation.'" (quoting *United States v. Goetzke*, 494 F.3d 1231, 1235 (9th Cir. 2007))); *United States v. Perez-Rodriguez*, 13 F.4th 1, 13 (1st Cir. 2021) ("To prove an attempt, the government must establish both a specific intent to commit the substantive offense and a substantial step toward its commission."); *United States v. Strubberg*, 929 F.3d 969, 974 (8th Cir. 2019) ("To prove attempt, the government must establish '(1) intent to commit the predicate offense; and (2) conduct that is a substantial step toward its

---

[8] The Government cites a handful of Fourth Circuit cases, (ECF No. 55 at 6–7), but none are instructive here because they analyze the *mens rea* required under § 1111, not § 1113.

commission.'" (quoting *United States v. Spurlock*, 495 F.3d 1011, 1014 (8th Cir. 2007))); *United States v. Hite*, 769 F.3d 1154, 1162 (D.C. Cir. 2014) (finding that attempt offenses require the defendant to "complete[] a 'substantial step'" "with the clear intent to cause the harm proscribed by the statute."); *United States v. Pavulak*, 700 F.3d 651, 669 (3d Cir. 2012) ("The crime of attempt requires the specific intent to commit a crime . . . and a substantial step towards the commission of that crime."); *United States v. Vigil*, 523 F.3d 1258, 1267 (10th Cir. 2008) ("To prove an attempt crime, the government must prove an (1) intent to commit the substantive offense; and the (2) 'commission of an act which constitutes a substantial step towards commission of the substantive offense.'" (quoting *United States v. Smith*, 264 F.3d 1012, 1015 (10th Cir. 2001))); *United States v. Murrell*, 368 F.3d 1283, 1286 (11th Cir. 2004) ("To sustain a conviction for the crime of attempt, the government need only prove (1) that the defendant had the specific intent to engage in the criminal conduct for which he is charged and (2) that he took a substantial step toward commission of the offense."); *United States v. Crowley*, 318 F.3d 401, 407 (2d Cir. 2003) ("To establish an intent to commit an offense, the government must prove beyond a reasonable doubt that the defendant '(1) had the intent to commit the crime, and (2) engaged in conduct amounting to a "substantial step" towards the commission of the crime.'" (quoting *United States v. Rosa*, 11 F.3d 315, 337 (2d Cir. 1993))); *United States v. Bilderbeck*, 163 F.3d 971, 975 (6th Cir. 1999) ("For an individual to be convicted of an attempt crime, the government must demonstrate a defendant's intent to commit the proscribed criminal conduct together with the commission of an overt act that constitutes a substantial step towards commission of the proscribed criminal activity."); *United States v. Thompson*, 130 F.3d 676, 688 (5th Cir. 1997) ("The crime of attempt requires the Government to prove that the defendant (1) intended to commit the underlying offense, and (2)

9

took a 'substantial step,' beyond mere preparation, toward committing that crime." (quoting *United States v. Polk*, 118 F.3d 286, 291 (5th Cir. 1997), *abrogated on other grounds by Abramksi v. United States*, 573 U.S. 169 (2014))).

Thus, attempted second-degree murder under § 1113 requires the defendant to (1) have had the specific intent to commit murder and (2) taken a substantial step towards committing murder.[9]

d.

The facts here militate against finding attempted second-degree murder because Defendant lacked the specific intent to kill. As recounted above, Defendant drove his car down Leon Sullivan Way, parked it in the street, and got out. He then walked to the sidewalk, where he and Kennedy had a less-than-friendly conversation. Once that was over, Defendant returned to his SUV, content to end the encounter. Defendant never raised his gun during this argument. *Supra* n.2. It was not until he was in his vehicle and ready to leave—after Kennedy had yelled "pull that shit on me!" while carrying a 12-guage—that Defendant ever raised his gun. Even when Defendant fired, both rounds were well off the mark—one hit a doorframe, and the other struck a window, inches from the ground. The Court sincerely doubts that Defendant cannot hit the broad side of a barn. The Court instead believes that Defendant aimed at the ground, hoping to scare Kennedy and buy himself time to flee. For that reason, the Court cannot find, by a preponderance of the evidence, that Defendant acted with the specific intent to commit murder. He therefore did not commit attempted second-degree murder.

---

[9] This two-part test mirrors West Virginia's attempted murder requirements, Syl. Pt. 1, *State v. Burd*, 419 S.E.2d 676 (W. Va. 1991), so the analysis here will match that under West Virginia law.

2. Wanton Endangerment

The Court now turns to wanton endangerment. West Virginia Code § 61-7-12 provides, in pertinent part, that "[a]ny person who wantonly performs any act with a firearm which creates a substantial risk of death or serious bodily injury to another shall be guilty of" wanton endangerment.[10] The Supreme Court of Appeals of West Virginia has defined "the elements of wanton endangerment [as]: (1) the defendant (2) did wantonly perform (3) with a firearm (4) an act (5) creating substantial risk of (6) death or serious bodily injury to another." *Mirandy v. Smith*, 787 S.E.2d 634, 639 (W. Va. 2016) (emphasis omitted) (quoting *State v. Wright*, 490 S.E.2d 636, 640 (W. Va. 1997) (per curiam)). Notably, this Court has previously defined "wanton" to mean "more than recklessness—it is a conscious or intentional disregard for the rights or safety of others; it is recklessness-plus, so to speak." *United States v. Honeycutt*, No. 2:10-cr-00057-1, 2011 WL 2471024, at *6 (S.D. W. Va. June 20, 2011).

"Typical cases of wanton endangerment involve the pointing or discharge of a firearm toward a person or a place where a person might be." *United States v. Arnold*, No. 5:21-cr-00197, 2022 WL 3448702, at *3 (S.D. W. Va. Aug. 17, 2022) (collecting cases). But, as Judge Volk recently observed, the "statutory language covers a broad[er] swath of conduct." *Id.* The defendant need not discharge the gun, Syl. Pt. 5, *State v. Hulbert*, 544 S.E.2d 919 (W. Va. 2001), or even possess a loaded gun, *United States v. Laudermilt*, 576 F. App'x 177, 182 (4th Cir. 2014), to satisfy the act requirement. Instead, *any* wanton act involving a firearm (loaded or not) that creates a substantial risk of death or serious bodily harm is sufficient—even brandishing. *United States v. Sumpter*, No. 2:15-cr-00067, 2016 WL 398223, at *2 (S.D. W. Va. Jan. 6, 2016) (citing

---

[10] Wanton endangerment is a felony punishable by up to five years imprisonment. *See* W. Va. Code § 61-7-12.

11

*State v. Bell*, 565 S.E.2d 430, 434 (W. Va. 2002), for the proposition that brandishing "may also constitute the 'act' required for wanton endangerment.").

Given this breadth, the Court easily concludes that section 61-7-12 covers Defendant's conduct. Defendant here fired multiple rounds at a crowd of people less than 10 yards away in downtown Charleston.[11] Courts routinely find that shooting toward others (though not necessarily aiming at them) is a wanton act that creates a substantial risk of death or serious bodily injury. *Arnold*, 2022 WL 3448702, at *2–3 (finding wanton endangerment when the passenger in a vehicle fired multiple shots out the driver's side window, directly in front of the driver's face); *State v. Collins*, No. 19-0633, 2020 WL 5269836, at *1–2, *5 (W. Va. Sept. 4, 2020) (memorandum decision) (affirming wanton endangerment convictions where the defendant fired 16 shots into an occupied home); *State v. John H.B.*, No. 18-0905, 2019 WL 5092948, at *2–3 (W. Va. Oct. 11, 2019) (memorandum decision) (affirming wanton endangerment conviction where the defendant, from inside the home, shot into occupied bedrooms). This case is no exception.

B. *Cross-Reference*

Having found that Defendant committed wanton endangerment, the Court must now determine which Guidelines section to cross-reference. A seemingly simple task, this case is somewhat trickier because there is no wanton endangerment Guidelines section.

Fortunately, though, the Guidelines provide a gap-filler for situations like these—§ 2X5.1. It provides that "[i]f the offense is a felony for which no guideline [exists], [the Court must] apply

---

[11] Making matters worse, these events transpired on the opening day of the 2022 Charleston Sternwheel Regatta festival, which attracted over 200,000 people to downtown Charleston. Jake Flatley, *Charleston Sternwheel Regatta Brought in over $31 Million to the City, Event Officials Say*, METRO NEWS (July 21, 2022, 3:43 PM), https://wvmetronews.com/2022/07/21/charleston-sternwheel-regatta-brought-in-over-31-million-to-the-city-event-officials-say/.

the most analogous offense guideline." U.S.S.G. § 2X5.1. This is a two-step process. The Court first determines if there is *any* "sufficiently analogous offense guideline." U.S.S.G. § 2X5.1 cmt. background. If so, the Court then "appl[ies] the guideline that is *most* analogous," should there be multiple.[12] *Id.* (emphasis added.) The Court, in making these determinations, can consider all relevant conduct. U.S.S.G. § 1B1.2(b); *see also Carroll*, 3 F.3d at 101; *United States v. Lambert*, 994 F.2d 1088, 1092 (4th Cir. 1993).

Here, the parties dispute which Guidelines section is most analogous to wanton endangerment. The Government contends that § 2A2.2—the aggravated assault section—is most analogous to wanton endangerment. (ECF No. 55 at 5.) Defendant, meanwhile, points the Court to § 2A2.3, which covers assault. (*See* ECF No. 54.) With this in mind, the Court begins its two-step analysis.

    1. Aggravated Assault and Assault are Both Sufficiently Analogous Offenses

As noted above, the Court must first identify all Guidelines sections that are sufficiently analogous to wanton endangerment. U.S.S.G. § 2X5.1 cmt. background. But, in doing so, the Court need not search for a perfect match, *United States v. Terry*, 86 F.3d 353, 358 (4th Cir. 1996), because, by definition, an analogy "implies [a] difference," *United States v. Jackson*, 862 F.3d 365, 376 (3d Cir. 2017) (quoting *United States v. Langley*, 919 F.2d 929, 930–31 (5th Cir. 1990)). Instead, a Guidelines section is sufficiently analogous when it lands "within the same proverbial 'ballpark' as the [other] offense." *United States v. Clark*, 981 F.3d 1154, 1163 (10th Cir. 2020) (quoting *Jackson*, 862 F.3d at 376).

---

[12] But if there is no sufficiently analogous Guidelines section, the Court applies "the provisions of 18 U.S.C. § 3553." U.S.S.G. § 2X5.1 cmt. background.

13

Taking things in order, the Court first concludes that § 2A2.2 is sufficiently analogous to wanton endangerment. Section 2A2.2, as relevant here, defines "aggravated assault" as "a felonious assault that involve[s] . . . a dangerous weapon with intent to cause bodily injury (*i.e.*, not merely to frighten) with that weapon." U.S.S.G. § 2A2.2 cmt. n.1. This largely tracks Defendant's wanton endangerment offense—he feloniously assaulted Kennedy by shooting towards him. The lone difference between the two—Defendant's mental state—is immaterial here. Defendant may not have intended to cause bodily injury, but he still wantonly disregarded a substantial risk of injury or death, which, for present purposes, is a distinction without a difference. *Terry*, 86 F.3d at 358 (explaining that the defendant's conduct need "not match the Guidelines' definition of aggravated assault perfectly" because "a perfect match is not required"); *see also Honeycutt*, 2011 WL 2471024, at *6 (concluding that "'wanton' is more than recklessness—it is a conscious or intentional disregard for the rights or safety of others; it is recklessness-plus, so to speak").

Section 2A2.3 is also sufficiently analogous. Section 2A2.3 is essentially the Guidelines' catch-all for assault: it applies to "misdemeanor assault[s] and batter[ies]" as well as "any felonious assault[s] not covered by § 2A2.2." U.S.S.G. § 2A2.3 cmt. background. Notably, this includes assaults that involve the possession or threatened use of a firearm. U.S.S.G. § 2A2.3(a)(1). Because Defendant assaulted Kennedy with a firearm, the Court finds that § 2A2.3 and wanton endangerment are sufficiently analogous to one another.

2. Aggravated Assault is the Most Analogous Offense Guideline

Now that the Court has determined that both § 2A2.2 and § 2A2.3 are sufficiently analogous to cover Defendant's conduct, the Court must decide which section best fits the facts. U.S.S.G. § 2X5.1 cmt. background. The answer, of course, is § 2A2.2.

The reason for this is simple enough—§ 2A2.2 accounts for Defendant firing his gun. *See* U.S.S.G. § 2A2.2(b)(2)(A) (imposing a 5-level increase when a firearm is discharged). Section 2A2.2 thus captures all of Defendant's relevant conduct, thereby accounting for the danger he caused others. Section 2A2.3 does not. *United States v. Dowtin*, 174 F. App'x 140, 142 (4th Cir. 2006) (per curiam) ("[A]ssault under USSG § 2A2.3(a)(1) . . . does not take into consideration the discharging of a firearm during an assault and speaks only to the threatened use of a firearm."). If the Court were to cross-reference § 2A2.3, the Guidelines would fail to consider all of Defendant's truly reprehensible conduct. For that reason, the Court finds that § 2A2.2 is "the most analogous offense guideline" to Defendant's wanton endangerment offense. U.S.S.G. § 2X5.1.

C. Calculated Offense Level

One final step is required. Section 2K2.1's cross-reference only applies "if the resulting offense level [from §2A2.2] is greater than that" produced under § 2K2.1. U.S.S.G. § 2K2.1(c)(1)(A). Here, § 2K2.1 provides an adjusted offense level of 18.[13] So, the cross-reference only comes into play if § 2A2.2 produces a higher adjusted offense level than 18.

---

[13] Defendant received a base offense level of 14 under § 2K2.1(a)(6), and then a 4-level enhancement for using the illegally possessed "ammunition in connection with another felony offense" under § 2K2.1(b)(6)(B), thus bringing his total to 18. (PSR at 8, ¶¶ 20–21.)

15

Section 2A2.2 does so, calling for an adjusted offense level of 19. Section 2A2.2 imposes a base offense level of 14. U.S.S.G. § 2A2.2(a). Defendant also receives a 5-level enhancement because he discharged a firearm. U.S.S.G. § 2A2.2(b)(2)(A). That tallies to 19, which is one level higher than his adjusted offense level under § 2K2.1. The Court must therefore substitute § 2A2.2 for § 2K2.1 when Defendant's calculating total adjusted offense level.

### IV.   CONCLUSION

For the foregoing reasons, the Court finds (1) that Defendant committed wanton endangerment under West Virginia law, and (2) that § 2A2.2 is the applicable Guidelines section to cross-reference.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to the Defendant and counsel, the United States Attorney, the United States Probation Office, and the United States Marshal.

ENTER:   July 14, 2023

THOMAS E. JOHNSTON, CHIEF JUDGE